**Affirmed and Memorandum Opinion filed August 27, 2013.**



In The

# Fourteenth Court of Appeals

## NO. 14-12-00468-CR

## NICHOLAS PAUL AKER, Appellant,

## V.

## THE STATE OF TEXAS, Appellee.

**On Appeal from the 179th District Court**
**Harris County**
**Trial Court Cause No. 1305419**

## M E M O R A N D U M   O P I N I O N

A jury found appellant Nicholas Paul Aker guilty of aggravated robbery with a deadly weapon and assessed his punishment at life imprisonment. We affirm.

I

On the night of May 5, 2011, complainant Walter Moore was working as an unregistered cab driver when he picked up a group of four passengers—Aker,

Brshai Peters, Norris Briscoe, and Jasmine Stelly. Moore drove them to their final destination, an apartment complex, and then got out of the van to open the sliding door on the passenger's side of the vehicle. When Moore walked back to the driver's side, Peters blocked his path, pulled out a gun, and demanded Moore's wallet and keys. Moore complied, and then started to run. Peters and Aker, who had been standing behind Moore, both shot at him before getting back in the van and driving away. Aker, Peters, Briscoe, and Stelly fled to Keisha Davis's apartment in Temple.

Meanwhile, despite being shot six times, Moore made it to the nearby apartment complex, where a resident saw him and called 911. He was taken to the hospital for emergency surgery and spent the next month in the intensive-care unit.

Officer Kevin Carr and Sergeant R.W. Chappell, both of the Houston Police Department, were assigned to investigate the robbery. Over the next two days, the officers learned Aker's and Peters's full names, Aker's cell phone number, and Stelly's and Briscoe's first names. They also had photographs of Aker and Peters, but only physical descriptions of Stelly and Briscoe. The officers obtained warrants to arrest Aker and Peters and to search Aker's phone records, through which they traced his location to the apartment complex in Temple.

On Sunday, May 8, Carr and Chappell drove to Temple, where the apartment complex was already under surveillance by officers from the Temple Police Department, including Officer Keith Mueller. Later that afternoon, Aker and Peters left the apartment complex on foot and walked to a nearby parking lot, where the Temple SWAT team arrested them. Aker and Peters confirmed the number of the apartment in which they had been staying, and Mueller and several other officers went to the apartment to look for Stelly and Briscoe. Davis answered the door but denied that there was anyone named Jasmine or Norris in the

2

apartment. Mueller, however, saw a male and a female who fit Briscoe's and Stelly's descriptions sitting in Davis's living room, and he asked them their names. They identified themselves as Norris and Jasmine. Mueller told them the police were looking for them and asked them to come outside, where they were detained.

With Davis's written consent, the officers then searched the apartment. They found a handgun in a black, drawstring backpack that was in the recliner where Briscoe had been sitting, and they also found a box of ammunition in a large, plastic container on the living room floor. The officers later learned that both the backpack and the container belonged to Aker.

Before trial, Aker moved to suppress the gun and the ammunition, arguing the searches of his backpack and container were unlawful. The State argued the searches were lawful because Davis had apparent authority to consent, because there was no evidence that the plastic container was closed when the officers entered the apartment, and because the black bag had been in Briscoe's possession and searched incident to his arrest. The trial court concluded that Aker had standing to challenge the searches but ultimately overruled his motion.

Following a trial on the merits, a jury convicted Aker of the charged offense and assessed his punishment at life imprisonment. On appeal, Aker argues that the trial court violated his due-process rights by (1) overruling his motion to suppress Moore's out-of-court identification of Aker; (2) overruling Aker's motion to suppress Moore's in-court identification of Aker; (3) failing to instruct the jury on the unreliability of eyewitness identification; and (4) overruling Aker's motion to suppress the gun and the ammunition. We affirm.

II

In his first and second issues, Aker argues the trial court violated his due-

3

process rights by overruling his motion to suppress Moore's pretrial and in-court identifications of Aker, alleging that the pretrial-identification procedure was impermissibly suggestive and that it tainted Moore's in-court identification. We address these issues together.

## A

An in-court identification is inadmissible if it is tainted by an impermissibly suggestive pretrial photographic identification. *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999). To determine whether a pretrial identification procedure was so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law, we use a two-step analysis, inquiring (1) whether the pretrial procedure was impermissibly suggestive, and if so, (2) whether the suggestive pretrial procedure gave rise to a very substantial likelihood of irreparable misidentification at trial. *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995) (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968)). The analysis requires an examination of the totality of the circumstances surrounding the particular case and a determination of the reliability of the identification. *Id.*; *Cantu v. State*, 738 S.W.2d 249, 251 (Tex. Crim. App. 1987).

A pretrial identification procedure may be suggestive by the manner in which it is conducted, such as if a police officer points out the suspect or suggests that the suspect is included in the photo array. *Barley*, 906 S.W.2d at 33. Suggestiveness may also arise if the suspect is the only individual closely resembling the pre-procedure description. *Id.*

Ultimately, it is the appellant's burden to demonstrate by clear and convincing evidence that the in-court identification is unreliable, and identification testimony is admissible if the indicia of reliability outweigh the influence of an

impermissibly suggestive pretrial identification. *Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993); *In re G.A.T.*, 16 S.W.3d 818, 827 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("[U]nless it is shown by clear and convincing evidence that the witness'[s] in-court identification of the defendant as the suspect was tainted by improper pretrial procedure and confrontations, the in-court identification is always admissible.") (citing *Jackson v. State*, 628 S.W.2d 446, 448 (Tex. Crim. App. 1982)). Whether the pre-trial identification procedure in this case was impermissibly suggestive is a mixed question of law and fact that does not turn on an evaluation of witnesses' credibility and demeanor, and we review such questions de novo. *See Loserth v. State*, 963 S.W.2d 770, 773 (Tex. Crim. App. 1998).

B

In this case, Carr showed Moore four photo arrays, one for each suspect, about eighteen days after the robbery. Moore was still in the intensive-care unit. Carr admonished Moore that each "group of photographs may or may not contain a picture of the person or persons who committed the crime," and that Moore was to look at each picture in the array before telling Carr whether or not he saw the person or persons who committed the crime. After Moore signed a written copy of the admonishments, Carr showed him the first photo array, which contained pictures of six individuals, including Aker. After looking at each picture, Moore positively identified Aker as one of the men who had been involved in the robbery. Moore signed his name next to Aker's picture to indicate his identification. He then said he thought another person in the array may have been one of his assailants, but Carr explained that there was only one suspect pictured in each array. Moore never wavered about his identification of Aker. Carr then showed Moore the second and third arrays, which pictured Peters and Briscoe,

5

respectively, but Moore did not recognize anyone in those arrays. Finally, Carr showed him the fourth array, in which Moore identified Stelly. Carr then told Moore that he had correctly identified two of the suspects. At trial, Moore testified that he made both his pretrial and in-court identifications of Aker based on his recollection of Aker being present during the robbery.

## C

Aker contends this identification procedure was impermissibly suggestive because Carr told Moore that there was only one suspect pictured in each array and that Moore had correctly identified two of the suspects. But as the trial court pointed out, Carr made both of these comments after Moore identified Aker. Both Moore and Carr testified that Moore was positive about his identification of Aker and that although Moore thought a second person pictured in the first array may have been another one of his assailants, he never doubted his identification of Aker. Additionally, Moore clearly did not feel compelled to choose a photograph because he did not choose anyone in two of the arrays.

Aker also emphasizes that Moore was not wearing his glasses at the time and that Carr held the photo array while Moore looked at it. But both Moore and Carr testified that Moore instructed Carr how to hold the array so that Moore could see it, and Aker does not suggest how Carr's holding the array may have otherwise influenced Moore's identification.[1]

Therefore, we conclude the pretrial identification procedure was not impermissibly suggestive, and we need not consider whether the procedure gave

---

[1] For the first time on appeal, Aker argues the pretrial identification was unduly suggestive because it was not double-blind or sequential. Because he did not make these arguments in the trial court, he has not preserved them for appeal. *See In re G.A.T.*, 16 S.W.3d at 827 ("Texas courts stringently apply the contemporaneous[-]objection rule in the context of suggestive identification procedures.").

6

rise to a very substantial likelihood of irreparable misidentification.[2] *See Barley*, 906 S.W.2d at 33. We overrule Aker's first and second issues.

III

In his third issue, Aker argues the trial court violated his due-process rights by failing to instruct the jury on the unreliability of eyewitness identifications. Aker neither requested such an instruction nor objected to its omission at trial. On appeal, however, he argues that the omission "deprived [him] of a key due-process protection . . . and amounted to egregiously harmful error."

A

When reviewing a claim of jury-charge error, we first determine whether there was error in the charge. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). If there was error and the appellant objected at trial, we must reverse if the error caused him some harm. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985); *Barrios*, 283 S.W.3d at 350. If there was error and the appellant did not object, however, we reverse only if the error caused him egregious harm. *Almanza*, 686 S.W.2d at 171. Importantly, the analytical framework for analyzing harm does not apply unless the appellate court first finds error in the jury charge. *Posey v. State*, 966 S.W.2d 57, 61 (Tex. Crim. App. 1998).

Article 36.14 of the Code of Criminal Procedure provides the requirements and procedures for the delivery of the trial court's charge to the jury, and its plain language mandates that "a defendant must object to the charge before he may be

---

[2] To the extent we can understand Aker's argument to challenge the reliability of Moore's in-court identification based on reasons independent of the pretrial photo array, we note that the United States Supreme Court has recently concluded that "[t]he fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." *Perry v. New Hampshire*, 132 S. Ct. 716, 728 (2012).

heard to complain on appeal about 'errors claimed to have been committed in the charge, as well as errors claimed to have been committed by omissions therefrom or in failing to charge upon issues arising from the facts.'" *Id.* (quoting Tex. Code Crim. Proc. art. 36.14). Therefore, "when *Almanza* speaks of 'erroneous' omissions of issues in the court's charge, it speaks of omissions of issues upon which a trial court has a duty to instruct without a request from either party or issues that have been timely brought to the trial court's attention." *Id.* at 63–64. And although the trial judge has "an absolute *sua sponte* duty to prepare a jury charge that accurately sets out the law applicable to the specific offense charged," he does not have a "similar *sua sponte* duty to instruct the jury on all potential defensive issues, lesser-included offenses, or evidentiary issues. These are issues that frequently depend upon trial strategy and tactics." *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007); *see Taylor v. State*, 332 S.W.3d 483, 487 (Tex. Crim. App. 2011) ("We have previously held that [a]rticle 36.14 imposes no duty on trial courts to *sua sponte* instruct the jury on unrequested defensive issues. . . . An unrequested defensive issue is not the law applicable to the case.") (citing *Posey*, 966 S.W.2d at 62).

B

In this case, Aker neither requested an instruction on the unreliability of eyewitness identification nor objected to the omission of such an instruction at trial. And because trial courts have no duty to *sua sponte* instruct juries about all potential defensive issues and evidentiary theories, Aker cannot complain of this omission for the first time on appeal. *See Delgado*, 235 S.W.3d at 249–50; *Posey*, 966 S.W.2d at 61–64. Accordingly, we overrule Aker's third issue.

IV

In his fourth issue, Aker argues the trial court erred by overruling his motion

to suppress the evidence of the gun and ammunition that the officers found when they searched Davis's apartment.

A

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion. *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002). In this review, we give "almost total deference to the trial court's determination of historical facts" and review the court's application of search-and-seizure law de novo. *Guzman v. State*, 955 S.W.2d 85, 88–89 (Tex. Crim. App. 1997). When, as here, the trial court did not make explicit findings of historical facts, we review the evidence in the light most favorable to the trial court's ruling. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Id.* at 447–48 (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)).

Both the state and federal constitutions protect individuals against official intrusion into places where and things in which individuals have a reasonable expectation of privacy. *See* U.S. Const. amend. IV; Tex. Const. art. I, § 9. Additionally, article 38.23 of the Code of Criminal Procedure provides: "No evidence obtained by an officer . . . in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." Tex. Code Crim. Proc. art. 38.23. Fourth Amendment rights are personal rights and therefore cannot be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1979); *Kothe v. State*, 152 S.W.3d 54, 59 & n.7 (Tex. Crim. App. 2004).

A defendant seeking to suppress evidence obtained in violation of the Fourth

9

Amendment has the burden of proving facts establishing that he personally had a legitimate expectation of privacy in the place or thing that the government invaded.[3] *Ex Parte Moore*, 395 S.W.3d 152, 158 (Tex. Crim. App. 2013); *Kothe*, 152 S.W.3d at 59. To carry this burden, the defendant must normally prove (1) that by his conduct, he exhibited an actual subjective expectation of privacy, and (2) that circumstances existed under which society was prepared to recognize his subjective expectation as objectively reasonable. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). In determining whether a given claim is reasonable, courts consider the totality of the circumstances, including: (1) whether the accused had a property or possessory interest in the thing seized or the place invaded; (2) whether the accused was legitimately in the place invaded; (3) whether the accused had complete dominion or control and the right to exclude others; (4) whether, before the intrusion, the accused took normal precautions customarily taken by those seeking privacy; (5) whether the accused put the place to some private use; and (6) whether the accused's claim of privacy is consistent with historical notions of privacy. *See id.* This list of factors is not exhaustive, and no single factor is dispositive of a particular assertion of privacy. *Granados v. State*, 85 S.W.3d 217, 223 (Tex. Crim. App. 2002).

B

In this case, Aker does not challenge the search of the apartment, to which Davis consented, but he argues he did have a reasonable expectation of privacy in

---

[3] Although this analysis is frequently expressed in terms of standing, the United States Supreme Court has concluded that the type of standing required when a defendant challenges a search under the Fourth Amendment "is more properly subsumed under substantive Fourth Amendment doctrine. . . . The inquiry under either approach is the same. But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." *Rakas*, 439 U.S. at 139; *see also Ex parte Moore*, 395 S.W.3d at 158 n.4.

10

his backpack and in his plastic container. We address the search of each item separately.

1

We begin with the search of Aker's black, drawstring backpack, which police found in a recliner in Davis's living room. "A general expectation of privacy in a purse or backpack is reasonable because such baggage is intended as a repository of personal effects." *Wilson v. State*, 99 S.W.3d 767, 770 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). Furthermore, Aker demonstrated his subjective expectation of privacy in the contents by placing them in the opaque bag, which was pulled closed by drawstrings. *See United States v. Villarreal*, 963 F.2d 770, 773 (5th Cir. 1992) ("Individuals can manifest legitimate expectations of privacy by placing items in closed, opaque containers that conceal their contents from plain view.").

Nevertheless, Aker's reasonable expectation of privacy in the bag was diminished under the circumstances of this case. Aker was not present at the apartment when the bag was searched, he no longer had dominion and control over the bag or its contents, and he had relinquished the right to exclude others from the same. And although Aker had a possessory interest in the bag prior to the search, he transferred that interest to Briscoe by leaving it in Briscoe's control. In doing so, Aker assumed the risk that Briscoe would reveal the contents to others and frustrate Aker's expectation of privacy. *See Pham v. State*, 324 S.W.3d 869, 876 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd), *cert. denied*, 132 S. Ct. 247 (2011). Aker also did not take normal precautions taken by those seeking privacy, such as instructing Briscoe not to look in the bag, despite knowing that Briscoe had looked in the bag earlier that day. Aker also did not tell Briscoe not to let anyone else handle or look inside the bag. Further, Mueller testified that because the bag

11

was made of thin, nylon material, it was immediately apparent that it contained a handgun when Mueller picked up the bag from Davis's recliner. Therefore, the evidence does not support a conclusion that Aker's subjective expectation of privacy was objectively reasonable under the circumstances.

2

We now turn to the search of the plastic container. Again, the fact that the container was opaque indicates Aker's subjective expectation of privacy as to its contents. *See Villarreal*, 963 F.2d at 773. The evidence also shows that the lid was resting on top of the container's overflowing contents, which indicates some expectation of privacy.

Again, however, considering the totality of the circumstances, we conclude that any subjective expectation of privacy Aker may have had in the container and its contents was not objectively reasonable. First, Aker was not present at the time of the search, and he did not have dominion and control over the container at the time. Further, although Aker had a possessory interest in the container and its contents at some point before the search, he compromised that interest when he left the container in Davis's apartment while he was gone. Aker also failed to take normal precautions customarily taken by those seeking privacy because, as the State pointed out at trial, there is no evidence that the container was closed. Aker also left it unsecured on the floor of Davis's living room, where it was plainly visible to anyone who came into the apartment. And although an overnight guest has an expectation of privacy in his host's home, this expectation is controlled to a significant degree by the wishes of his host. *See, e.g.*, *Granados*, 85 S.W.3d at 224 ("These statements in *Olson* suggest that when, for example, the host chooses to allow others, such as police, inside . . . the guest's expectation of privacy diminishes.") (discussing *Minnesota v. Olson*, 495 U.S. 91, 99 (1990)).

12

In sum, considering the totality of the circumstances, we conclude that whatever subjective expectations of privacy Aker had in the backpack and the container were not objectively reasonable given the specific facts of this case, and thereforethe trial court did not err by denying his motion to suppress. *See Villarreal*, 935 S.W.2d at 138–39. Accordingly, we overrule Aker's fourth issue.

\* \* \*

Having overruled all of Aker's issues, we affirm the trial court's judgment.

/s/    Jeffrey V. Brown
        Justice

Panel consists of Justices Brown, Christopher, and McCally.

Do Not Publish — TEX. R. APP. P. 47.2(b).

13